IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:06 CR 3054 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| JOSH W. JOHNSON and | ) | REPORT AND RECOMMENDATION |
| MARTIN D. LOSBY, | ) | |
| | ) | |
| Defendants. | ) | |

The defendants have filed motions to suppress evidence obtained as a result of a traffic stop in Interstate 80 in Nebraska on February 18, 2006. The matter was heard before me on June 30, 2006 and is now ready for decision. The evidence includes a videotape of the traffic stop and another videotape of interviews with the defendants.

Defendant Losby's motions, filings 23 and 24, challenge the legitimacy of the stop and Losby's detention at the scene beyond the time required for completing the purpose of the traffic stop. He seeks suppression of all evidence obtained after completion of the traffic portion of the stop, as "fruits"[1] of the illegal stop and/or detention, obtained in violation of the Fourth Amendment. In addition, he seeks to suppress statements made by him later in the Grand Island headquarters offices of the Nebraska State Patrol as involuntarily made in violation of the Fifth Amendment.

---

[1] See, Wong Sun v. United States, 371 U.S. 471, 484-486 (1963)("fruits of the poisonous tree").

Defendant Johnson's motion, filing 26, also challenges the length of his detention after completion of the traffic portion of the stop, and seeks suppression of all evidence and statements obtained as a result thereof, as "fruits" obtained in violation of the Fourth Amendment.

FACTS

On Saturday, February 18, 2006 the defendants were traveling eastbound on I-80 in Hall County, Nebraska when, at 1:04 p.m.,[2] their vehicle, a Jeep Cherokee licensed in South Dakota and owned and driven by Johnson, was stopped by Nebraska State Patrol Trooper Jeff Roby for speeding. Trooper Roby approached the vehicle from the rear on the passenger side. Through the front passenger window he asked for the driver's operator's license and the vehicle's registration, and advised the driver that he had "clocked" the vehicle going 81 mph in a 75 mph zone. He told Johnson he would be issued a warning citation and asked him to come back to the trooper's patrol vehicle. Johnson disputed the speeding, saying he had his cruise control set at 75. Roby responded by saying that 81 was the speed the radar had indicated. Roby was given the vehicle's registration and Johnson's South Dakota operator's license. Losby did not have a license and produced a South Dakota identification card.

---

[2] The videotape shows the time to be 11:04 a.m. instead of 1:04 p.m. Roby testified that the display was incorrect by a "couple of hours." For purposes of this matter, I have used the times shown on the videotape, but substituting "1" for "11" in the "hour position." Although the "minute" display also may not be accurate, it is suitable for recording the time intervals.

2

On the way to the patrol vehicle Roby noticed something in one of Johnson's pockets. He asked Johnson what it was, and Johnson replied that it was just some vitamins. He asked Johnson if he had any weapons or anything that might cause Roby harm. Johnson replied he did not. Roby asked to see the object in the pocket, and Johnson said, "No." Roby explained he had to "make sure it's not a weapon," and Johnson reluctantly reached into his pocket to retrieve it. Once Roby saw that it was a pill bottle and not a weapon, he said "That's good enough. Okay," and Johnson put it back in the pocket. During the ensuing pat search Johnson turned slightly away from Roby. Roby remarked that Johnson seemed nervous, which Johnson denied.

In the patrol vehicle Roby took the number of Johnson's South Dakota operators licence and called it into his dispatcher to check its validity and for any wants or warrants for Johnson, as well as any criminal history. He also had his dispatch check the vehicle's registration. In the process of checking these documents, Roby asked about the purpose of the pair's travels. Johnson replied that they had been in Denver, having arrived there from Sioux Falls, S.D. on Friday evening. He said they had left Denver early that morning, Saturday, for the return trip to Sioux Falls. He said the purpose of the trip was to see "some buddies."

Roby went back to the Jeep and asked Losby the same questions about their purposes and destinations. Losby's answers were the same as Johnson's, except that Losby said the pair had arrived in Denver on Thursday, not Friday night as Johnson had said. Losby confirmed that they had traveled to Denver together.

The dispatcher advised that Johnson's South Dakota license was suspended, the Jeep was registered to him, and that neither of the

3

occupants had any drug-related criminal history.  Johnson said his South Dakota license was reinstated after his "DUI back in college.  Roby had dispatch check for a license in California, and after a few minutes, dispatch advised his California license was valid.  Roby confirmed that Johnson had said they'd arrived in Denver on Friday night, and said, "That's a quick trip, then."  Johnson did not respond.  Roby completed the warning citation and gave it to Johnson, along with the license, registration, and Losby's identification card.  Fourteen minutes had elapsed from the time the Jeep pulled off the roadway.

   Roby then asked Johnson if he could ask him a few more questions.  Johnson, who had been turning toward the door to open it and leave the patrol vehicle, turned back towards Roby and took his hand off the door's handle.  Roby took that action as Johnson's agreement for Roby to ask him more questions.  Roby asked Johnson if there were any drugs or guns in the Jeep, which Johnson denied.  Roby then asked Johnson for permission to search the vehicle, and Johnson denied consent to search.  Roby asked Johnson, "Why'd he tell me you got there on Thursday?"  Johnson's response is inaudible.  Roby asked Johnson if he'd consent to wait there for a drug dog to be summoned to sniff the Jeep.  Johnson said, "Whatever you want to do, but there's nothing in there, so you don't need to."  Roby testified that he then asked the question again, and Johnson said, "Yes."  The videotape has Roby saying, "So you just want to wait here while I get him out here?"  Johnson's response is not audible, but almost immediately Roby said "Okay."  I infer from the tone and timing of the "okay" that Johnson was somehow giving an affirmative response.

   Roby then went back to the Jeep and asked Losby the same questions, and Losby also denied there were any such items in the

4

Jeep.  Roby asked Losby for permission to search it.  Losby said the vehicle belonged to Johnson, not him, so Roby would have to ask Johnson for permission.  Roby then advised that a drug dog was going to be coming to the scene.

Roby returned to his unit and called dispatch for a drug dog, and also requested "38" to come to assist, at 11:22.  Sometime after the request was made, Roby said to Johnson, "I don't understand why you don't want me to search your vehicle."  Johnson responded by asking Roby if there was something wrong with that, and Roby said, "No.  That's your right."

Hall County Sheriff's Deputy Andrew Fairbanks arrived on the scene with his canine, "Bo," at 1:52, 48 minutes after the stop of the Jeep.  Roby asked Losby to exit the Jeep and sit in the patrol unit, and had him sit in the back passenger seat.  Roby pat-searched Losby before having him sit in the patrol unit.

The videotape shows Fairbanks walking the dog around the Jeep.  Although the dog showed interest in the vehicle, he did nothing unusual to demonstrate that he had found the source of an odor of drugs.  Nevertheless, Fairbanks advised Roby that the dog had "alerted like six times, which is good enough for me, so I'm going to call it."  He later asked Roby, "...alert, no indication?" and Roby responded, "Yeah."  This may have related to Fairbanks' recording the dog's actions, but it is not clear on the videotape.

Fairbanks then advised Johnson and Losby that the dog had "indicated, uh, alerted" to the Jeep.  Roby then requested Johnson to give him the pill bottle, "'cause now I can search."  Johnson complied.  Roby opened it and almost immediately recognized its

5

contents as "ecstasy."[3]  Both defendants were then arrested.  Upon his arrest, Losby was also searched, and $2,666 in cash was found on his person.

The defendants were transported to the Nebraska State Patrol Troop C Headquarters office in Grand Island, Hall County, Nebraska. Each was interviewed by NSP Investigator James Pederson.  The interviews took place in a small "recording" interview room with no windows.  Pederson was armed, but his weapon was not ever visible during the interviews.  The defendants were in handcuffs.  The conversations were videotaped,(Exhibit 11), and Pederson testified that the taping equipment was started before the first interviewee entered the room and was turned off after the second had left the room.

Losby was interviewed first.  After asking him his "biographical information," Pederson produced an "Advice of Rights" form which also included a place for a waiver of rights, as well. Exhibit 7.  Pederson read the rights to Losby and Losby indicated that he understood them by placing his initials beside each.  Then in response to Pederson's asking if Losby would waive his rights and agree to speak with Pederson without a lawyer present, Losby declined, and said he wanted a lawyer.  Pederson then stopped the interview and took Losby "downstairs" to a "classroom."

Pederson then summoned or obtained Johnson for his interview. His interview consumed about twenty to thirty minutes, and is not, itself, a subject of the motion to suppress.  It is challenged only insofar as it is claimed to be "fruits of the poisonous tree." Wong Sun, supra.

---

[3] 3,4-methylenedioxy methamphetamine (MDMA).

6

After the conclusion of Johnson's interview, sometime between 4:00 and 5:00 p.m., Pederson and Roby went to the "classroom" where Losby had been waiting. During the interim Losby had apparently been allowed to use the rest room and get a drink of water. He had not, however, met with an attorney. Pederson witnessed him sign a "Voluntary Disclaimer of Interest and Ownership" in the $2,666.00 seized from him earlier in the afternoon. Exhibit 8.

Losby was presented the form by Trooper Roby. Roby told Losby that generally, if people cooperate, it benefits them later. He told Losby that the dog had "hit" on the money that had been seized from Losby's person, connecting it with the odor of drugs. He also explained that if Losby signed the disclaimer, he would be giving up any rights he had to the money, and would not have to go to court "again" for a hearing on the money, but only on the criminal charges related to the possession of the drugs. Losby said he didn't think that was right. Roby told him he would be charged on the criminal case whether he signed the disclaimer or not. Losby was "pretty calm" during the discussion and was not impaired in any way. He never asked any questions about the form, and neither officer asked Losby about the money. Neither officer made any threats or promises as an inducement to Losby to sign the form. Losby never said or indicated that he would not sign the form, did not ask again for an attorney before signing it, and in fact did sign it.

Following Losby's signing of the disclaimer form, both defendants were transported to the Hall County Jail. There is no evidence that either made any statements en route.

DISCUSSION

<u>The Stop</u>.

Both defendants first challenge the legitimacy of the traffic stop. Trooper Roby testified extensively about his usual procedures in testing the Doplar radar equipment at the beginning and end of his shift, about his testing it and finding it accurate both at the beginning and end of his shift on February 18, 2006, and about his use of the equipment in "clocking" the defendants' vehicle. I am satisfied that a reasonable officer in Trooper Roby's position who clocked an oncoming vehicle at 81 mph in a 75 mph zone has probable cause to initiate a traffic stop. Even a minor traffic violation provides probable cause for a traffic stop. <u>United States v. Barragan</u>, 379 F.3d 524, 528 (8th Cir. 2004); <u>United States v.Martinez</u>, 358 F.3d 1005, 1009 (8th Cir. 2004)). The defendants' first challenge fails.

<u>The Detention</u>.

Both defendants also challenge the expansion of the traffic stop into a criminal investigation after the purpose of the traffic stop—-issuance of the warning citation--had been completed.

> It is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. <u>United States v. Jacobsen</u>, 466 U.S. 109 (1984). A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.

<u>Illinois v. Caballes</u>, 543 U.S. 405, 407 (2005).

After stopping a vehicle, an officer can check the driver's identification and vehicle registration, ask the driver to step out

of his vehicle, and ask routine questions concerning the driver's destination and the purpose of his trip. United States v. Long, 320 F.3d 795,(8th Cir. 2003); United States. v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994)(citing United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993); United States v. Richards, 967 F.2d 1189, 1192-93 (8th Cir. 1992)). The officer may detain a vehicle occupant while performing the routine tasks of writing a citation, and completing computerized checks of a driver's license, vehicle registration, and the criminal histories of vehicle occupants. United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004); United States v. White, 81 F.3d 775 (8th Cir. 1996).

It is also true that an officer may not expand a traffic stop into a criminal investigation unless s/he has reasonable articulable suspicion that criminal activity may be afoot. United States v. Morgan, 270 F.3d 625, 631-32 (8th Cir. 2001); United States v. Edmisten, 208 F.3d 693, 694 (8th Cir. 2000); United States v. Carrate, 122 F.3d 666, 668 (8th Cir. 1997); United States. v. Ramos, 42 F.3d at 1163. In this case Trooper Roby's observations and questioning of both defendants during the duration of the traffic stop revealed the following:

- Johnson appeared to Roby to be "noticeably nervous" when he exited his vehicle;

- Johnson did not want to allow Roby to do a pat-down search of his person before he sat in the patrol vehicle;

- Johnson turned slightly away from Roby on his way back to the patrol vehicle, as if to hide the pill bottle;

- Johnson refused Roby's request to see the bottle;

- Johnson said the contents of the bottle were only vitamins, but when asked why, then, he did not want Roby to see it, still refused to show it;

- Defendants had made a very fast trip to Denver from Sioux Falls, S.D., which is approximately a ten-hour, one-way trip;

- Roby was told that the purpose of the trip was only to "see buddies," and neither defendant said there was any special event or other explanation for the fast trip;

- There was a minor discrepancy in the defendants' report as to when they had arrived in Denver, Johnson saying Friday night and Losby saying Thursday night, and when Roby asked for an explanation of that, neither had a reason that satisfied Roby's suspicions;

- Roby knew from his training and ten years' experience as a road trooper, including more than thirty stops in which he personally had uncovered "more than personal use" drugs and more than sixty others in which he had been involved in such discoveries, that Denver is a major "distribution center" for illegal drugs.

On the other hand, Roby's observations and questioning also revealed:

- The defendants were consistent in their descriptions of the trip's origin and destination;

- Defendants were also consistent in their statements of where and with whom each had spent the previous night;

- Defendants were also consistent in their reports of the time they had left Denver that morning;

10

- Defendants were also consistent in their reports that Losby had not assisted in the driving;

- The defendants' documents and vehicle registration were all in order, and the occupants knew each other;

- The vehicle was being driven by its owner, not a rental vehicle driven by someone other than the renter;

- Neither defendant had any prior drug-related criminal records;

- Roby had not observed any contraband or "indicators" of contraband in the defendants' vehicle.

- While Johnson had seemed quite nervous, Losby did not.

Balancing these circumstances, I conclude that although these facts are clearly insufficient to establish probable cause, Trooper Roby did have a reasonable, articulable suspicion to expand the stop into an investigation for criminal activity by asking Johnson if there were drugs or guns in the vehicle, and, when Johnson denied their presence, to ask for his consent to search it.

That conclusion is not essential to resolving the motions, however, because the evidence establishes that Johnson consented to "wait here for a drug dog" to sniff his vehicle. "Law enforcement officers do not violate the Fourth Amendment by asking a person for consent to search or other types of cooperation, even when they have no reason to suspect that person, 'provided they do not induce cooperation by coercive means.'" United States v. Yang, 345 F.3d 650, 654 (8th Cir. 2003)(quoting United States v. Drayton, 536 U.S. 194, 201 (2002)). In this instance the evidence shows that Roby asked Johnson if he would consent to "wait here" for a drug dog to

11

come and sniff the vehicle. Johnson said, "Whatever you want to do...." Roby then asked,"So you just want to wait here while I get him out here?" and Johnson said or indicated an affirmative answer. There is no evidence of any deception or coercion on Roby's part to induce Johnson's consent, and it occurred less than twenty minutes into the stop. Therefore, his consent transformed the stop into a consensual encounter until the drug dog arrived.

The Sniff.

Deputy Fairbanks and his dog were "certified" as a "Narcotics Detector Dog Team" in November of 2003, following a five-week "school." Since then they were re-certified annually, the last time before this stop being March 31, 2005, and they have weekly training sessions. The training and certification are done by officers of the Nebraska State Patrol. Exhibit 5. Bo is a "passive indicator," meaning that his "signal" to Deputy Fairbanks that he has detected the strongest source of the odor of drugs is to sit down, lie down, or stand in place and stare at the location. Bo is certified in detecting marijuana, cocaine, heroin, and methamphetamine; ironically, he is not certified in detecting the drug found in this case, ecstasy.

When Fairbanks took Bo around the defendants' vehicle, Bo did not sit down, lie down, or stand in place and stare at any location on the vehicle. Afterward, Fairbanks told Roby that the dog had "alerted like six times, which is good enough for me, so I'm going to call it."

Significantly, "alert" is a term of art in the parlance of the Nebraska State Patrol, by which Deputy Fairbanks and Bo were trained. Deputy Fairbanks testified that the term means that the dog has changed its behavior by altering its breathing pattern and

12

perhaps becoming more nasal in its breathing, perhaps slowing down, or in other ways manifesting an interest in sniffing for drugs. He stated that an "alert" is subtle, often recognizable only to the dog's handler, and means the dog has shown active interest in the item searched, has recognized the odor of drugs, but has not located the strongest source of the odor. On the other hand, an "indication" is the dog's way of showing that he has found the strongest source of the odor of drugs. He also testified that Bo, like other drug detection dogs, sometimes "alerts" without the "alert" leading to an "indication," and also that sometimes, for a number of reasons, drugs are not found after he has "indicated" the presence of their odor.

The evidence is clear that Bo did not "indicate" any source of the odor of drugs in the defendants' vehicle. The evidence is also clear that Fairbanks did not tell Roby the dog had "indicated" the presence of drugs, but only that Bo had "alerted."[4] The question is whether this action by the dog established probable cause to search the Jeep.

In United States v. Heir, 107 F. Supp. 2d 1088 (D. Neb. 2000), both Judge Kopf and I found a drug dog's "alert" alone--that is, without an "indication"--insufficient for the establishment of probable cause.

> [T]here must be an objectively observable "indication" by the dog of the presence of drugs. See, United States v. Jacobs, 986 F.

---

[4] There was no testimony of Roby's understanding of the terms "alert" and "indicate," although it is quite inconceivable that a road trooper of his experience with the Nebraska State Patrol would not know the distinction between the terms. From his affirmative answer to Fairbanks' question, "...alert, no indication?" I infer he knew the difference.

> 2d 1231 (8th Cir. 1993) (warrant affidavit stating that drug sniffing dog had displayed interest in package, without disclosing that no ["indication"] had occurred, rendered warrant invalid). Because it is undisputed that [the dog] did not positively "indicate" the presence of drugs in the vehicle, as he was trained to do, there was no probable cause for the search.

107 F. Supp. 2d at 1091. (Judge Kopf's decision) (footnote omitted). For reasons fully explained in Heir, an officer's subjective interpretation of a dog's ambiguous action was insufficient to be considered as a "fact" establishing probable cause. Id. Just as in Heir, Bo did not "positively indicate" on the defendants' vehicle. Because the other circumstances then present[5] fell short of establishing probable cause, there was no probable cause justifying the warrantless searches of the vehicle, Johnson, or Losby. All evidence gathered as a result of the unlawful searches, therefore, must be suppressed.

Because of this conclusion, I need not address Losby's separate contention about the voluntariness of his statements in connection with the signing of the disclaimer document.

IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. §636(b)(1)(B) that the defendants' motions to suppress, filings 23, 24, and 26, be granted.

The parties are notified that failure to object to this recommendation as provided in the local rules may result in a

---

[5] During the wait for the arrival of the drug dog, Roby prodded Johnson by saying things like, "I don't understand why you don't want me to search." I do not consider Johnson's maintaining his denial in response to such prodding to establish probable cause, either separately or in conjunction with the other extant circumstances.

14

waiver of the right to appeal the district judge's adoption of findings in the recommendation.

DATED July 14, 2006

BY THE COURT:

s/ *David L. Piester*
United States Magistrate Judge